## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 95-CA-00359-SCT

*IN THE MATTER OF PETITION OF STANLEY*
*CARPENTER FOR ZONING VARIANCE*

*v.*

*CITY OF PETAL*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/03/95 |
| TRIAL JUDGE: | HON. RICHARD WAYNE MCKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL CLAYTON BAREFIELD |
| ATTORNEY FOR APPELLEE: | THOMAS W. TYNER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED - 9/11/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/2/97 |

**BEFORE DAN LEE, C.J., McRAE AND SMITH, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This appeal arises from a March 3, 1995 order of the Forrest County Circuit Court dismissing with prejudice the Bill of Exceptions filed by Stanley Carpenter subsequent to the Mayor and Board of Aldermen of the City of Petal's denial of his request for a zoning variance. Carpenter sought to place a mobile home on his ninety-two acre farm, zoned Rural Fringe, despite a city ordinance restricting such residences to designated mobile home parks. Because Carpenter was not afforded due process, we reverse the order of the circuit court.

I.

¶2. Stanley Carpenter owns a ninety-two acre parcel of land in an area of Petal, Mississippi zoned as a Rural Fringe (RF) District. He sought to place a mobile home for his son on a small area of the property, sited some five hundred feet from the road and protected from view by a stand of mature trees. According to Section 6.01 of City Ordinance 1979(42),

> The RF District is composed of certain lands and structures in the city having a low density,
> predominately single-family character and additional open area. Although this district differs

from the rural environment in that its emphasis is upon suburban-urban development rather than rural activities, it is recognized that agriculture and the raising of poultry and livestock may still be a major activity in this district, and provision is therefore made for limited forms of such activity with appropriate safeguard for nearby residences.

Permitted uses within the RF District include agriculture, farming, forestry and livestock production; nurseries and truck gardens; public or commercial stables and kennels; poultry, livestock and small animal raising; single-family dwellings; two-family dwellings; accessory uses including signs and incidental home occupations.

¶3. Section 6.113 of Ordinance 1979(42) and amended Ordinance 1979(42-A 59), defining mobile home and modular home units,[1] provided that a single mobile home unit or modular home on a parcel of land outside a mobile home park was a permitted use in RF, R-3, R-4, C-2 and I-1 districts only as caretaker dwelling units. In December, 1989, that provision was amended by Ordinance 1979 (42-A 60) to provide as follows:

> 1. A single mobile home unit or modular home unit on a parcel of land outside of a mobile home park shall be a permitted use in the RF (Rural Fringe) district only.

The ordinance was amended again on February 19, 1991 by Ordinance 1979 (42-A 70), which prohibited the placement of mobile home units outside of approved mobile home parks. The Statement of Intent of that section of the City's ordinance dealing with mobile homes and modular homes was amended to provide as follows:

> The purpose of this Section is for the establishment of areas within Petal, Mississippi, for the development and expansion of mobile home parks. These mobile home parks shall be developed and located so as to provide safe and sanitary living conditions for the occupants and to be convenient to employment, shopping centers, schools and other community facilities, and to prohibit Single Mobile Home Units from being used and utilized within the City Limits unless placement is in an approved Mobile Home Park, as described in this ordinance.

While the rest of the amendment addresses both mobile home units and modular home units, the Statement of Intent Section makes no mention of modular homes. Section 6.113 of the ordinance further was amended to govern the use of single mobile home units outside of designated parks:

> 1. Mobile home units or Modular Home Units presently existing, in Rural Fringe only, may continue as a non-conforming use, even on change of ownership, or occupancy. However, no replacement of presently existing Mobile Home Units or Modular Home Units in Rural Fringe will be permitted.

No provision was made for use of mobile homes or modular homes as caretaker units or temporary housing.

¶4. Against this backdrop of changes in the local zoning laws, Carpenter filed an application for a variance to place a mobile home on a specified site on his land after an earlier petition to put the unit anywhere on the ninety-two acre property was denied. His request was denied at a properly noticed variance hearing held by the Board of Aldermen on November 23, 1993.

¶5. At a January 18, 1994 appeal hearing, Carpenter presented to the Board of Aldermen a stipulation of facts surrounding his request for a variance. Included was a showing of the requests for variances and/or rezoning granted and refused by the Board of Aldermen since the 1991 amendment to the mobile home ordinance. The minutes of the Board's meetings indicate that most of the variances requested have been granted by the Board. Carpenter's attorney advised the Board that placement of the mobile home on the site would not constitute a nuisance and that because Carpenter is frequently out of town, his son would serve as a caretaker for the property. He further asserted that the ordinance was discriminatory and had been applied inconsistently. The Board voted to take the matter under consideration.

¶6. At the next scheduled meeting of the Board of Aldermen, held on February 1, 1994, without any notice to Carpenter or his attorneys, a petition opposing the variance was presented to the Board. Signed by thirty-five residents of the Carterville Community, the petition indicated that these individuals

> . . .object to the re-zoning and/or variance requested on the Stanley Carpenter property. We DO NOT want a mobile home nor a mobile home park placed in our neighborhood by Stanley Carpenter, Roger Denham, or anyone else.

At that meeting, the Board unanimously voted to deny Carpenter's appeal of the denial of his petition for a variance.

¶7. Pursuant to Miss. Code Ann. § 11-51-75, Carpenter filed a notice of appeal of the Board's decision in the Forrest County Circuit Court on February 9, 1994. In addition, he filed a Bill of Exceptions on March 10, 1994. His case was consolidated with another variance appeal and the matters set for oral argument on February 17, 1995. The circuit court found the appeals from the Board's decisions to be without merit and dismissed Carpenter's petition with prejudice.

II.

¶8. Carpenter first contends that he was denied procedural due process by the Board's failure to provide him with notice that a petition opposing his request for a zoning variance would be presented at the regularly scheduled Board meeting on February 1, 1994 and that a decision on his appeal would be made at that time.

¶9. In ***Thrash v. Mayor and Commissioners of the City of Jackson,*** 498 So. 2d 801 (Miss. 1986), where this Court rejected procedural due process challenges raised by objectors to the rezoning of lands contained within the Jackson flood plain, we stated that "the essence of the due process rights, if any, guaranteed to Thrash and the other Objectors is reasonable advance notice of the substance of the rezoning proposal together with the opportunity to be heard at all critical stages of the process." ***Thrash,*** 498 So. 2d at 808 (citing ***Mullane v. Central Hanover Bank & Trust Co.***, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865, 873 (1950)). The record in that case demonstrated that the objectors had"ample" advance notice of the substance of the proposed changes and further, that they were given " full and fair opportunity to present their views." ***Id.***

¶10. In light of the petition opposing Carpenter's variance presented at the February 1, 1994 meeting, the Mayor and the Board's argument that they were free to take up Carpenter's request for a variance

and to vote on it at their next scheduled meeting without any further notice to him misses the point. The properly noticed hearing on Carpenter's appeal was held on January 18, 1994. Thus, while Carpenter had the opportunity to present his case at the January meeting, he did not receive a full and fair opportunity to respond to the concerns raised by the opponents to his variance at the February 1, 1994 meeting. Couched in the language of *Thrash*, we therefore find that Carpenter was denied "the opportunity to be heard at all critical stages of the process."

III.

¶11. Carpenter next asserts that Ordinance (42-A 70) constitutes impermissible exclusionary zoning because it limits the placement of mobile homes to designated mobile home parks, thus prohibiting an individual from locating a mobile home on land he owns and requiring him, instead, to pay rent to the owner of a mobile home park. He further contends that the ordinance, as drafted, bears no reasonable relationship to any legitimate governmental interest. The City of Petal counters that the ordinance is a valid exercise of its police power intended to protect property values in surrounding residential areas.[2]

¶12. Miss. Code Ann. § 17-1-39 (2) (1989) provides municipalities and counties with the authority to regulate the zoning of "factory manufactured movable homes" as follows:

> Any municipality or county of this state may adopt and enforce zoning or other land use regulations or ordinances relating to factory manufactured movable homes, including, but not limited to, regulations and ordinances which establish reasonable appearance and dimensional criteria for factory manufactured movable homes, provided that such regulations and ordinances do not have the effect of prohibiting factory manufactured movable homes which otherwise meet applicable building code requirements from being lawfully located in at least some part or portion of the municipality or county.

"Factory manufactured movable home," for purposes of this section, is defined by Miss. Code Ann. § 75-49-3(c).[3] Miss. Code Ann. § 17-1-39(1) (1989).

¶13. This Court has held that "[t]he classification of property for zoning purposes is a legislative rather than a judicial matter." *Faircloth v. Lyles,* 592 So. 2d 941, 943 (Miss. 1991); *W.L. Holcomb, Inc. v. City of Clarksdale,* 217 Miss. 892, 900, 65 So. 2d 281, 284 (1953). Thus, zoning decisions will not be set aside unless clearly shown to be arbitrary, capricious, discriminatory, illegal or without a substantial evidentiary basis. *Faircloth,* 592 So. 2d at 943; *Barnes v. Board of Supervisors, DeSoto County*, 553 So. 2d 508, 510 (Miss. 1989). There is a presumption of validity of a governing body's enactment or amendment of a zoning ordinance and the burden of proof is on the party asserting its invalidity. *Id.* Where the point at issue is "fairly debatable," we will not disturb the zoning authority's action. *Id., Saunders v. City of Jackson,* 511 So. 2d 902, 906 (Miss. 1987).

¶14. The same standards apply when the constitutionality of a zoning ordinance is challenged. The issue then is whether the ordinance is a valid exercise of the police power, defined as "'that power required to be exercised in order to effectively discharge, within the scope of constitutional limitations, its paramount obligation to promote and protect the health, safety, morals, comfort and general welfare of the people.'" *Great South Fair v. City of Petal,* 548 So. 2d 1289, 1292 (Miss. 1989), quoting *LaSalle National Bank v. Chicago*. 5 Ill. 2d 344, 125 N.E.2d 609 (1955). An

ordinance is a valid exercise of the police power if it is substantially related to the public health, safety, morals or general welfare. *Village of Euclid v. Ambler Realty,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Substantive due process requirements are met if an ordinance serves a public purpose, the means adopted are reasonably necessary to accomplish that purpose and the regulation is not unduly oppressive. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). "The key inquiry is whether the question [of the existence of a legitimate reason for a particular zoning ordinance] is 'at least debatable' . . . If it is, there is no denial of substantive due process as a matter of federal constitutional law." *Vance v. Bradley,* 440 U.S. 93, 110-111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979).

¶15. The Mayor and Board of Aldermen assert first that the ordinance is a valid exercise of the police power because it complies with § 17-1-39 in allowing mobile homes to be located in "at least some part or portion of the municipality." They argue that if the Legislature had desired to provide for the location of mobile homes outside of mobile home parks, it could have done so. They further contend that the ordinance is rationally related to the legitimate government purpose of protecting residential property values, stating:

> The City of Petal has made a legislative decision to restrict the location of single mobile homes to approved mobile home parks. *Such an effort at protecting property values of surrounding residential areas in the city is a legitimate governmental objective.* Restricting mobile homes in that manner rationally relates to the protection of those property values.

(emphasis added). Finally, the Mayor and Board argue that the ordinance is reasonable because Carpenter or any other land owner can establish a mobile home park on his property if he meets the requirements set out in the ordinance.

¶16. Carpenter contends that there is no nexus between any stated purpose and the absolute prohibition of mobile homes outside of designated parks. He further argues that more narrowly-crafted restrictions would better serve the goal or providing safe and sanitary living conditions in mobile home parks as articulated in Section 6.11 of the ordinance. Finally, he asserts that "the complete exclusion of private ownership of land for the placement of mobile homes is clearly a denial of substantive due process in that it bears no rational basis to any governmental interest and/or is not narrowly tailored to further a substantial governmental interest."

¶17. The Board's assertion that restriction of mobile homes and modular housing to mobile home parks is necessary to protect property values in surrounding residential areas rings hollow. Were individual mobile homes and/or other forms of manufactured housing prohibited only in R-1 and R-2 residential districts, it would, at least, be fairly debatable whether the ordinance, as drafted, was necessary to meet its intended purposes. Prohibiting individual mobile home or even modular home sites in *any* area other than designated mobile home parks, however, bears no relationship to the goal of preserving surrounding residential property values. In the Rural Fringe District, where Carpenter's property is located, permitted land uses include agriculture, farming, forestry and livestock production; nurseries and truck gardens; public or commercial stables and kennels; poultry, livestock and small animal raising; single-family dwellings; two-family dwellings; and accessory uses including signs and incidental home occupations. As the Mississippi Manufactured Housing Association points out,

In the Rural Fringe District, Petal will allow commercial stables, dog runs, pig pens and chicken yards within 100 feet of a property line, but have [sic] refused to allow Mr. Carpenter to locate his manufactured home 550 feet from the street on a 100 by 200 foot tract in the middle of his 92 acres.

\* \* \* \* \*

The City of Petal's ordinance, allowing varied poultry, livestock, agricultural and forestry uses but disallowing manufactured housing, cannot be based on aesthetic concerns. There is no requirement for any screening of old forestry equipment such as scooters, worn out tractors or other agricultural equipment, or even pig pens or dog runs.

Further, we fail to see how a blanket prohibition against mobile homes and manufactured housing on individual sites in any zoning district in the City relates to Section 6.111 of the ordinance's stated purpose of developing and locating mobile home parks "so as to provide safe and sanitary living conditions for the occupants and to be convenient to employment, shopping centers, schools and other community facilities." The provision is more restrictive than what is reasonably necessary to meet the purposes stated in Article 2 of the Ordinance, the most relevant of which states:

F. To achieve the design, density, and distribution of housing that will protect and enhance residential property values, and facilitate the provision of adequate and economic housing.

In fact, because of its apparent ban against all manufactured housing sited on individual lots anywhere in the City except in mobile home parks, the restriction in question even could be construed as contrary to the stated purposes of the Ordinance.

¶18. The Board's assertion that the ordinance is not unreasonable or unduly oppressive because Carpenter could always obtain a permit to establish a mobile home park on his property likewise is without merit. Section 6.112 enumerates the requirements for developing a mobile home park. So stringent are the requirements for a mobile home park that the Board's premise is tantamount to declaring that it is not unduly burdensome to restrict an individual from building a free-standing store on his property, because he's allowed to build a mall or strip shopping center there as long as he provides adequate parking, restaurant and restroom facilities, twenty-four hour security, and sets aside ten percent of the property for landscaping and a park.

¶19. Courts in other jurisdictions have reached a variety of fact-specific decisions on the issue of whether zoning restrictions on the placement of mobile homes and manufactured housing violates due process, depending on the nature of the restriction imposed and its relationship to the stated goals of the ordinances at issue. Generally, older cases predating stricter federal standards for the construction and safety of mobile homes and the advent of higher-priced manufactured housing, tend to favor more restrictive ordinances.[4] *See generally* J.M. Zitter, Annotation, *Validity of Zoning or Building Regulations Restricting Mobile Homes or trailers to Established Mobile Home or trailer Parks*, 17 A.L.R. 4th 106 (1982). In contrast, as the Georgia court found in determining that protection of property values did not justify an ordinance restricting placement of any manufactured housing to manufactured home parks,

. . . considering the improvement of modern manufactured homes; the fact that appropriate

steps can be taken to minimize the negative impact of the placement of manufactured homes near site-built homes; and the oppressive impact of the ordinance on individuals in need of manufactured housing, we conclude that the protection of property values cannot justify the ordinance's restriction of manufactured homes from all residential areas. See *Bourgeois v. Parish of St. Tammany*, La., 628 F. Supp. 159, 162 (E.D. La.1986). Having reviewed the Amendment in view of the facts of this case and the law, we conclude that it is arbitrary and unreasonable, and therefore unconstitutional. However,

> [t]his is not to say that a municipality must permit all mobile homes, regardless of size, appearance, quality of manufacture or manner of installation on the site, to be placed wherever site-built single family homes have been built or are permitted to be built. Nor do we hold that a municipality may no longer provide for mobile home parks. We hold only that a per se restriction is invalid; if a particular mobile home is excluded from areas other than mobile home parks, it must be because it fails to satisfy standards designed to assure that the home will compare favorably with other housing that would be allowed on that site, and not merely because it is a mobile home.

*Cannon v. Coweta County,* 260 Ga. 56, 389 S.E.2d 329 (1990), quoting *Robinson Township v. Knoll*, 410 Mich. 293, 302 N.W.2d 146, 154 (1981)(footnotes omitted). *See also* *Bourgeois v. Parish of St. Tammany, La*., 628 F. Supp. 159 (E.D. La. 1986)(protection of property values does not justify restriction of manufactured homes from all residential areas); *Geiger v. Zoning Hearing Board*., 510 Pa. 231, 507 A.2d 361 (1986)(zoning ordinance which allowed mobile homes on individual lots only for related person to provide care for disabled relative was "token exception" to total prohibition against mobile homes on individual lots and thus impermissible); *Luczynski v. Temple,* 203 N.J. Super. 377, 497 A.2d 211 (1985)(ordinance which relegated mobile homes to mobile home parks without consideration of size, appearance or safety standards had no reasonable basis and was unconstitutional). The Michigan Court further found that case law and statutes construing mobile homes as permanent dwellings and permitting them to be taxed as real property supported its position that there was no basis for a per se restriction against them.[(5)] *Robinson Township*, 302 N.W. 2d at 319-320, citing *Koester v. Hunterdon County Board of Taxation,* 79 N.J. 381, 399 A.2d 656 (1979); *Gates v. Howell,* 204 Neb. 256, 282 N.W. 2d 22 (1979).

¶20. In contrast, the Texas District Court found as a matter of law, that an ordinance restricting mobile homes to "limited areas" within the city did not violate substantive due process rights, "because a reasonable individual could argue that mobile homes may adversely affect the property values of surrounding areas." *Texas Manufactured Housing Assoc., Inc. v. City of Nederland,* 905 F. Supp. 371, 378 (E.D. Texas 1995). However, the *Nederland* opinion does not indicate how the aggrieved party's land was zoned and relies only on a state court decision in *City of Brookside Village v. Comeau,* 633 S.W. 2d 790 (Tex. 1982), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed. 2d 932 (1982). In *Comeau*, the court found that a town ordinance restricting mobile homes to mobile home parks and regulating the construction and maintenance of such parks was rationally related to the protection of public health safety, and welfare. As distinguished from the case *sub judice*, very specific and unique facts supported the court's decision: the town had no municipal water or sewer system, relying instead on septic tanks and individual water wells. Because of the peculiar soil conditions in the area, drainage was very poor, compounding the town's problems. Further, there had been a higher incidence of fires in mobile homes and the city had to plan for water well placement

for its small fire department. The ***Comeau*** court acknowledged that, at the time of its decision, there remained in use a great number of mobile homes manufactured prior to the 1976 federal construction and safety standards laws. ***Id.*** at 795. Indeed, the record reflected that more than half of the mobile homes in Brookside Village were manufactured prior to 1976. ***Id.***, n. 6. Thus, the court relied on that line of cases which has found that "the primary reason for restriction on mobile home location has been that 'cities . . . found it easier to provide police and fire protection and to regulate health conditions, as well as to provide necessary services such as water, sewage and lighting.'" ***Comeau,*** 633 S.W.2d at 794, quoting ***State v. Larson,*** 292 Minn. 350, 195 N.W. 2d 180, 184 (1972). Other cases on which the City of Petal relies likewise are distinguishable from the case *sub judice. See, e.g .* ***Duggins v. Town of Walnut Grove,*** 63 N.C. App. 684, 306 S.E.2d 186 (1983)(upheld ordinance which limited placement of mobile homes but allowed modular homes to be located in any area); ***Board of County Commissioners of the County of Jefferson v. Mountain Air Ranch***, 192 Colo. 364, 563 P.2d 341 (1977)(where ordinance restricting mobile homes to areas designated R-T was upheld, resort facility incorrectly asserted that burden was on county to show that trailers constituted nuisance or a hazard to public health or safety).

IV.

¶21. Carpenter further asserts that the ordinance constitutes an equal protection violation because it discriminates against "that certain class of persons unable to afford conventional housing and that certain class of persons, who, due to economic status, desire to own land and place thereon affordable housing." Aside from authority supporting his general proposition that no person or class of persons shall be denied equal protection of the law, Carpenter provides neither authority nor evidence to support his argument that the ordinance in question discriminates against a particular class of people. We, therefore, do not consider the argument raised. ***Ellis v. Ellis,*** 651 So. 2d 1068, 1073 (Miss. 1995).

V.

¶22. Carpenter was denied procedural due process by the Board's failure to provide him with notice that opposition to his request for a variance would be presented at the February 1, 1994 Board meeting. We therefore reverse the decision of the circuit court dismissing Carpenter's Bill of Exceptions.

¶23. **REVERSED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**LEE, C.J., PRATHER, P.J., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. SULLIVAN, P.J., NOT PARTICIPATING.**

1. The parties use the term "mobile home" in their briefs, although the record does not provide any details of the home Carpenter wished to place on his property.

    Section 5.47 of the Ordinance defines "mobile home" as follows:

A movable or portable dwelling to be transported on its own chassis and designed without a permanent foundation, whether or not a permanent foundation is subsequently provided, which may include one or more components that can be retracted for transporting purposes and subsequently expanded for additional capacity, or two (2) or more units, separately transportable but designed to be joined into one integral unit, as well as a portable dwelling composed of a single unit.

Section 5.50 further defines a "modular unit," stating:

A modular unit is a factory fabricated transportable building unit designed to be used by itself or to be incorporated with similar units at a building site into a modular structure on a permanent foundation to be used for residential, commercial, educational or industrial purposes.

The Mississippi Manufactured Housing Association, in its *amicus* brief, notes that pursuant to Miss. Code Ann. § 75-49-3(a) and (b), a "manufactured home" is a structure built after June 14, 1976 in accordance with federal construction and safety standards, while a "mobile home" refers to a structure built prior to June 14, 1976 and not in conformance with federal standards.

2. The Board's reliance on mobile home ordinances from other Mississippi cities avails it nothing. While the City of Madison's Zoning Ordinance, adopted in 1992, restricts mobile homes to R-M residential zones a/k/a mobile home parks, it allows for the temporary location of mobile homes in other areas during construction or when a house is destroyed. Further, because the ordinance does not use the term modular home, it could be construed as placing no restrictions on other forms of manufactured housing. The excerpts included in the record of the City of Ridgeland's Zoning Regulations, also adopted in 1992, provide for a Mobile Home Park Residential District (R-M). The sections provided for this Court's review do not indicate whether mobile homes or other types of manufactured housing are restricted to mobile home parks. Finally, the cover letter attached to excerpts from the City of Moss Point Zoning Ordinance indicate that although mobile homes are a permitted use only in R-5 districts (Mobile Home Residential Districts), they are also permitted in A-1 (Agricultural) areas by special exception, on properties in excess of three acres.

3. Miss. Code Ann. § 75-49-3(c) (1989) defines "factory manufactured movable homes" as including both mobile homes and relocatable homes. Section 75-49-3 (Supp. 1996), as revised and amended, however, does not employ the term "factory manufactured movable home," but defines manufactured home, mobile home, relocatable home and factory-built home. Section 17-1-39 (1) has not been amended to reflect the changes in § 75-49-3.

We also noted that pursuant to Miss. Code Ann. § 27-53-15 (1994), for tax purposes, the owner of a mobile home located on land he owns has the option of declaring the structure as real property or personal property. The statute further provides:

If the mobile home is to be classified as real property, then the wheels and axles must be removed and it must be anchored and blocked in accordance with the rules and procedures promulgated by the Commissioner of Insurance of the State of Mississippi. After the wheels and axles have been removed and the mobile home has been anchored and blocked in accordance with such rules and procedures, the mobile home shall be considered to have been affixed to a permanent foundation.

4. *See* **Robinson Township v. Knoll,** 410 Mich. 293, 302 N.W. 2d 146 (1980), regarding changing attitudes toward mobile homes and parks:

> "Community fear of blight can be traced to the low quality of both the early trailers and their parking facilities. Economic conditions of the 'thirties, followed by wartime housing shortages and rapid relocations of the labor force, pressed many thousands of unattractive trailers into permanent use. Often these units were without running water or sanitary facilities. There were no construction standards to insure even minimum protection against fire or collapse. They were parked in areas which were usually crowded, poorly equipped, and generally unsuited to residential use. As a result, conditions in these parks seldom exceeded minimum health and sanitation standards. The specter of such parks teeming with tiny trailers made community apprehension understandable. But substantial improvements in the quality of both mobile homes and park facilities may have undermined the bases for this antipathy today. The mobile home currently produced is an attractive, completely furnished, efficiently spacious dwelling for which national construction standards have been adopted and enforced by the manufacturers' associations."

*Id.* at 153, quoting Note, Toward an Equitable and Workable Program of Mobile Home Taxation, 71 Yale L.J. 702-703 (1962).

5. As discussed in n. 3, *supra*, Miss. Code Ann. § 27-53-15 provides mobile home dwellers who own the land on which their dwelling is located with the option of having the structure taxed as real or personal property.